IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: BITTREX, INC., | : | Chapter 11 |
| | : | Case No. 23-10598 (BLS) |
| Wind Down Entity. | : | Jointly Administered |
| | : | |
| ARABOUR., *et al.,* | : | Civ. No. 24-714-JLH |
| | : | (lead) |
| Appellants, | : | Civ. No. 24-716-JLH |
| v. | : | Civ. No. 24-719-JLH |
| | : | (consolidated) |
| THE PLAN ADMINISTRATOR, | : | |
| | : | |
| Appellee. | : | |

Adel Abbasi, Shahriar Arabpour, Amirali Momenzadeh,

   *Pro se appellants.*

Susheel Kirpalani, Patricia B. Tomasco, Robert A. Zink, Alain Jaquet, Razmig Izakelian, Joanna D. Caytas, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, NY; Robert S. Brady, Kenneth J. Enos, Rebecca L. Lamb, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE,

   *Counsel for appellee, David Maria, as Plan Administrator.*

**<u>OPINION</u>**

September 19, 2025

**HALL, U.S. DISTRICT JUDGE**

## I.   INTRODUCTION

The above-captioned appeals arise from the chapter 11 cases of Bittrex, Inc. and certain of its affiliates (together, "Bittrex" or the "Debtors"). *Pro se* appellants Adel Abbasi, Shahriar Arabpour, and Amirali Momenzadeh (together, "Appellants"), Iranian citizens, are cryptocurrency investors and traders who filed claims against the Debtors. Those claims seek recovery for alleged lost value and damages suffered when Appellants' accounts on Bittrex's exchange were frozen in 2017. Following plan confirmation, the Debtors, through their plan administrator, objected to Appellants' claims, arguing that the terms of service applicable to Appellants' accounts precluded any liability or recovery for incidental, consequential, or punitive damages, and thus precluded damages based on Appellants' inability to access their assets on the Bittrex exchange while their accounts were frozen. The Debtors further argued that Appellants could not pursue tort claims resulting from the disabling of their accounts. Following trial, the Bankruptcy Court issued comprehensive memorandum orders addressing each of the Appellants' arguments and evidence (BUS Bankr. D.I. 148, 149, 150) ("Memorandum Orders"),[1] and on June 5, 2024, the Bankruptcy Court issued accompanying orders sustaining the Debtors' claim objections, disallowing Appellants' claims for damages, and limiting Appellants' claims to the cryptocurrency associated with their accounts (BUS Bankr. D.I. 210, 212, 213) (the "Orders"). Appellants have appealed each of the Memorandum Orders and accompanying Orders.[2] On July 22, 2024, at the request of the parties, the appeals were consolidated. (D.I. 5.) For

---

[1] "Des. Bankr. D.I." refers to the docket of the chapter 11 case of Desolation Holdings LLC (Case No. Case 23-10597), and "BUS Bankr. D.I." refers to the docket of the chapter 11 case of Bittrex, Inc. (Case No. 23-10598). "AA-__" refers to the documents included in the appendix (Civ. No. 24-714-JLH, D.I. 21) to appellee's answering brief, including the following transcripts: AA-426–499 (the "12/13/23 Tr."); AA-717–784 (the "1/31/24 Tr."); AA500–612 (the "2/9/24 Tr."); AA-635–716 (the "2/13/24 Tr.");

[2] Civ. No. 24-714-JLH is Mr. Arabpour's appeal of Bankr D.I. 148, 212; Civ. No. 23-716-JLH is Mr. Abbasi's appeal of the Bankr. D.I. 149, 213; Civ. No. 24-719-JLH is Mr. Momenzadeh's

the reasons set forth below, the Court will affirm each of the Memorandum Orders and Orders.

## II.    BACKGROUND

### A.    The Debtors

The facts giving rise to this dispute are largely uncontested. *See In re Bittrex, Inc.*, 2024 WL 2347311, *2 (Bankr. D. Del. May 22, 2024) (setting forth detailed factual background with respect to the Debtors' business and their chapter 11 cases in connection with a ruling on separate claim objection). The Debtors comprise four entities: Bittrex Inc. ("BUS"), Bittrex Malta Ltd. ("Malta OpCo"), Desolation Holdings LLC ("Desolation"), and Bittrex Malta Holdings Ltd. ("Malta Holdings"). *Id.* at *2. BUS started in February 2014 with the incorporation of BUS's predecessor, Bittrex, LLC, in Nevada. *Id.* Malta OpCo is a Maltese private limited company that was created in 2018 to serve non-U.S. customers until it ceased operations in 2019. *Id.* Prior to commencing the chapter 11 proceedings, Bittrex operated a cryptocurrency exchange (the "Exchange") that provided "an online platform for access to the [cryptocurrency] exchange to customers in different jurisdictions." *Id.* (citing Des. Bankr. D.I. 11 ("First Day Decl.") at ¶ 1). The record reflects that Debtor BUS was a money services business that was required to comply with regulations issued by the Financial Crimes Enforcement Network ("FinCEN"), Office of Foreign Assets Control ("OFAC"), and Securities and Exchange Commission ("SEC"). *Id.*

### B.    Bittrex's 2015–2017 Compliance Program and OFAC Issues

In February 2016, Bittrex retained BlockScore, a third-party vendor, to screen customers and potential customers for compliance with sanctions programs of the United States government.[3] The

---

appeal of Bankr. D.I. 150, 210. The docket of the consolidated appeal, Civ. No. 24-714-JLH, is cited herein as "D.I. __."

[3] 2/9/24 Tr. at 52:5–9 (Maria testimony); AA-930–934 (Department of Treasury Release re OFAC Settlement with Bittrex, Inc.); AA-1473–1474 (OFAC License Application).

Debtors anticipated that BlockScore would provide comprehensive sanctions screening services, covering the detection of customers with a nexus to sanctioned countries.[4]  These services were necessary because sanctions imposed by the U.S. government prohibited residents of specified countries—including Iran—from joining or utilizing the Exchange.[5]  *In re Bittrex,* 2024 WL 2347311, at *2.  Indeed, it is undisputed that residents of Iran were not legally authorized to utilize the Exchange at that time, on account of pending sanctions.  *Id.*  However, in October 2017, Bittrex discovered that BlockScore only verified that Bittrex's customers were not included on the List of Specially Designated Nationals and Blocked Persons and other similar lists (the "SDN Lists") maintained by OFAC.[6]  As a result, customers who resided in Iran were improperly permitted to access the Exchange and traded on it until the fourth quarter of 2017.  David Maria (the "Plan Administrator"), who was later appointed as plan administrator under the Debtors' confirmed plan of liquidation, does not dispute that Bittrex violated OFAC regulations by offering and providing services to residents of Iran.[7]

On October 10, 2017, Bittrex received a subpoena from OFAC requesting information concerning Bittrex's relationship with entities or individuals in Iran (the "Subpoena").[8]  Upon receiving the Subpoena, Bittrex realized that BlockScore had not screened customers from Iran, and that Bittrex's relationship with such customers violated OFAC regulations.[9]  Immediately after

---

[4] 2/9/24 Tr. at 52:18–22 (Maria testimony).

[5] In basic terms, 31 C.F.R. § 560.204 and 31 C.F.R. § 560.206 prohibit a U.S. person from exporting services to Iran, including individuals who are ordinarily resident in Iran.

[6] 1/31/24 Tr. at 37:24–38:6 (Maria testimony).

[7] 2/9/24 Tr. at 55:21–24 (Maria testimony).

[8] AA-1468–71 (OFAC Subpoena to Bittrex); AA-1472 (OFAC License Application).

[9] 2/9/24 Tr. at 61:5–12 (Maria testimony).

receiving the Subpoena, Bittrex suspended the accounts of all customers with ties to Iran, including accounts belonging to Appellants, as set forth in greater detail below.[10]  The freeze imposed by Bittrex meant that funds that had been placed on the Exchange by residents of Iran could not be accessed or recovered from the Exchange.

In April 2018, the Debtors applied for an OFAC license, seeking authorization to release the assets of customers residing in Iran (the "Application").[11]  On September 26, 2019, BUS and Malta OpCo obtained a license from OFAC permitting the release of assets to customers in Iran (the "OFAC License").[12]  The OFAC License was set to expire on March 31, 2020.[13]  Starting in November 2019, BUS and Malta OpCo sent blast emails to all affected Iran customers—including Appellants— informing them of the License and advising them of the limited window of time during which they could withdraw the cryptocurrency in their suspended accounts.[14]

In October 2022, OFAC and Bittrex reached a settlement agreement regarding the onboarding and transactions of residents of Iran and other sanctioned jurisdictions (the "Settlement").[15]  Bittrex agreed to pay approximately $24.28 million in connection with its violation of OFAC regulations.[16] The Settlement reflected OFAC's determination that Bittrex's conduct was not egregious.[17]

---

[10] *Id.*

[11] AA-1472 (OFAC License Application).

[12] AA-1522 (OFAC License).

[13] *Id.*

[14] 1/31/24 Tr. at 41:17–22 (Maria testimony).

[15] AA-930–934 (Department of Treasury Release re: OFAC Settlement with Bittrex, Inc.).

[16] *Id.*

[17] 2/9/24 Tr. at 49:22–50:7 (Maria testimony); AA-930–34 (Department of Treasury Release re: OFAC Settlement with Bittrex, Inc.).

### C.    Appellants

#### 1.    Mr. Abbasi

Mr. Abbasi, an Iranian citizen, is a cryptocurrency investor and trader.  When Bittrex permitted Mr. Abbasi to open an account on the Exchange in October 2017, Mr. Abbasi provided Bittrex with an address in Iran and a copy of his Iranian passport.[18] As noted above, Bittrex was prohibited from offering services to Mr. Abbasi, or any persons residing in Iran, due to sanctions imposed by OFAC, and the Plan Administrator does not dispute that Bittrex violated OFAC regulations by offering and providing services to Mr. Abbasi in October 2017.

When he opened his account, Mr. Abbasi accepted the 2015 Terms of Service of BUS (the "2015 Terms of Service") by clicking the related acceptance box.[19]  The Plan Administrator testified that Mr. Abbasi would not have been able to access his account or make withdrawals without agreeing to the 2015 Terms of Service.[20]  The record reflects that Mr. Abbasi agreed to the 2015 Terms of Service to create and continue using his account.[21]

In October 2017, Bittrex blocked Mr. Abbasi's account to comply with the Iranian sanctions.[22] At that time, Mr. Abbasi held the following cryptocurrencies in his account: (i) 1.25 Bitcoin ("BTC");

---

[18] 1/31/24 Tr. at 35:13–17 (Maria testimony); Des. Bankr. D.I. 559 (Declaration in Support of Objection to Claims) at ¶ 5.

[19] 1/31/24 at 36:19–37:3 and 45:23–46:1 (Maria testimony); 2/9/24 Tr. at 12:23–13:6 (Maria testimony); AA-902 (response to claim objection, filed by Mr. Abbasi, stating "I have not accepted any terms other than those of the Terms of Service dating version 2015 with Bittrex LLC.").

[20] 2/9/24 Tr. at 12:17–13:6 (Maria testimony).

[21] 1/31/24 Tr. at 35:1–14, 36:19–37:3, 50:6–17 (Maria testimony); AA-902 (Mr. Abbasi's response to claim objection); *see also* 1/31/24 Tr. at 45:17–18, 45:23–46:1 (Maria testimony).

[22] 1/31/24 Tr. at 37:11–21 (Maria testimony); Des. Bankr. D.I. 559 at ¶ 6.

(ii) 79.10 Neo ("NEO"); and (iii) 24,937 LoMo Coin ("LMC").[23]  In February 2019, Mr. Abbasi asked Bittrex to release the assets in his account.[24]  Bittrex responded that his account remained suspended because "[f]ederal economic sanctions prohibits U.S. companies from engaging in economic transactions with the residents of . . . Iran."[25]

In April 2019, while Mr. Abbasi's account held 24,937.50 LoMo Coins ("LMC"), Bittrex (i) announced to all customers holding LMC that the cryptocurrency would be removed from the exchange because it did not have any market; and (ii) urged the affected customers to withdraw their LMC by June 21, 2019 lest the LMC become unrecoverable.[26]  Mr. Abbasi did not contact Bittrex to withdraw the LMC.[27]  However, the record reflects that, at that time, Bittrex could not have complied with a withdrawal request from Mr. Abbasi due to OFAC sanctions.[28]

In August 2019, Mr. Abbasi attempted to access Bittrex's site and while making this attempt, he accepted the 2018 Terms of Service of "Bittrex International" (the "2018 Terms of Service," and together with the 2015 Terms of Service, the "Terms of Service"), which relate to "any services made available by Bittrex, Inc. or Bittrex Malta Ltd. . . . under the name of 'Bittrex International.'"[29]  Being a non-U.S. resident, Abbasi was transitioned to Malta OpCo, and became a Malta OpCo customer.[30]

---

[23] AA-1174.

[24] AA-1116.

[25] *Id.*

[26] 2/9/24 Tr. at 10:9–11:2 and 71:16–21 (Maria testimony); Des. Bankr. D.I. 559 at ¶ 7.

[27] Des. Bankr. D.I. 559 ¶ 7.

[28] *Id.*

[29] 1/31/24 Tr. at 46:23–47:22 (Maria testimony); Des. Bankr. D.I. 559 ¶ 8; AA-64–94; AA-980.

[30] BUS Bankr. D.I. 149 at ¶ 9; Des. Bankr. D.I. 559 at ¶ 8.

Mr. Abbasi's acceptance of the 2018 Terms of Service did not entail any transfer of assets between Bittrex entities.[31]

Following the issuance of the License, and starting in November 2019, Malta OpCo sent blast emails to "all the email addresses of anyone whose accounts had been disabled" informing all customers with an Iranian nexus—including Mr. Abbasi—that it had obtained the License and providing detailed instructions to withdraw assets before the License expired.[32]  In response to one of the blast emails, Mr. Abbasi contacted the Exchange to withdraw his account balances consisting of 1.25 BTC and 79.10 NEO."[33]   Mr. Abbasi was able to complete these OFAC-authorized withdrawals in February 2020; as the cryptocurrencies remaining in his account (LMC) had been delisted and were valued at 0.00, Bittrex closed his account.[34]

Mr. Abbasi timely filed 13 proofs of claim seeking recovery in excess of $2,600,000 collectively from various Debtor entities.[35]   His claims are predicated on his assertion that his cryptocurrency lost value and that he suffered other consequential damages because he was unable to withdraw his assets from Bittrex between 2017 and February 2020.  Mr. Abbasi later withdrew nine of the Claims leaving four surviving Claims that he alleges have a cumulative value of $800,000.[36]

---

[31] 1/31/24 Tr. at 47:16–22 (Maria testimony).

[32] *See* BUS Bankr. D.I. 148 at ¶ 9 (citing 1/16/24 Tr. 91:13–20 (Maria testimony)); Des. Bankr. D.I. 559 ¶ 11.

[33] 1/31/24 Tr. at 42:6–13 and at 16–17 (Maria testimony); AA-1129.

[34] 1/31/24 Tr. at 57:23–58:6 (Maria testimony); 2/9/24 Tr. at 10:3–5 (Maria testimony); Des. Bankr. D.I. 559 at ¶ 12; AA-1130–31.

[35] BUS Bankr. D.I. 149 at ¶ 16; Des. Bankr. 558 at ¶¶ 27–63.

[36] *See id.*

### 2.    Mr. Arabpour

Appellant Mr. Arabpour, an Iranian citizen, is also a cryptocurrency investor and trader. When Bittrex permitted Mr. Arabpour to open an account on its Exchange in June 2017, Mr. Arabpour provided Bittrex with an Iranian address.[37]  Mr. Arabpour contends that, at the same time, he provided a phone number and passport for verification.  (D.I. 23 at 10.)  As noted above, Bittrex was prohibited by law from offering services at that time to Mr. Arabpour, or any persons residing in Iran, due to sanctions imposed by OFAC.  The Plan Administrator does not dispute that Bittrex violated the OFAC regulations by offering and providing services to Mr. Arabpour.  The Plan Administrator testified that Mr. Arabpour would not have been able to create or access his account or make withdrawals without agreeing to the 2015 Terms of Service.[38]

Mr. Arabpour used the Exchange from June through October 2017, making multiple deposits and withdrawals of cryptocurrency.[39]  In October 2017, Bittrex suspended Mr. Arabpour's account to comply with OFAC sanctions.[40]  In the following months, Mr. Arabpour unsuccessfully attempted to login to his account.

In November 2019, following the issuance of the License, BUS sent blast emails to "all the email addresses of anyone whose accounts had been disabled" informing all customers with an Iranian nexus—including Mr. Arabpour—that it had obtained the License and providing detailed instructions

---

[37] Des. Bankr. 555 at ¶ 1.

[38] 2/9/24 Tr. at 12:21–13:10 (Maria testimony).  Mr. Arabpour was not transitioned to Malta OpCo and remained classified as a BUS customer despite being a non-U.S. resident subject to OFAC sanctions.  Accordingly, he was never prompted to accept Malta OpCo's 2018 Terms of Service.

[39] Des. Bankr. D.I. 555 at ¶¶ 2–3.

[40] Des. Bankr. D.I. 555 at ¶ 4; 2/9/24 Tr. at 13:19–20; AA-1202.

to withdraw assets before the License expired.[41]  The record also contains a March 3, 2020 email from BUS advising Mr. Arabpour of the March 31, 2020 deadline and urging him to withdraw assets from the platform.[42]  Mr. Arabpour did not attempt any activity in his account during the withdrawal period authorized by the License.[43]  The License expired on March 31, 2020, which ended Bittrex's legal authority to return assets to residents of Iran, including Mr. Arabpour.

In June 2020, Mr. Arabpour contacted Bittrex to inquire about the then-expired opportunity to withdraw the assets in his account.[44]  The Plan Administrator testified about Mr. Arabpour's communications with Bittrex, which reflect that he received the March 2020 email regarding the License and the March 31, 2020 deadline.[45]  BUS customer support informed Mr. Arabpour that the deadline for withdrawals had passed and that his account must remain suspended due to OFAC sanctions.[46]

On May 8, 2023 (the "Petition Date"), the Debtors filed their chapter 11 petitions.  Shortly after the Petition Date, the Bankruptcy Court entered an order authorizing customers to withdraw their deposits of cryptocurrencies and fiat currencies as a continuation of the Debtors' orderly wind down process (the "Customer Withdrawal Order").  (Des. Bankr. D.I. 128.)  On June 16, 2023, Mr. Arabpour attempted to comply with the identification requirements under the Customer Withdrawal

---

[41] 1/16/24 Tr. 91:13–20 (Maria testimony).

[42] AA-1250; AA-1522; 1/31/24 Tr. at 61:12–16.

[43] Des. Bankr. D.I. 555 at ¶ 11.

[44] AA-1250; AA-1522.

[45] *See* AA-1250–51 (correspondence from Arabpour acknowledging that his "account [had] been frozen for years because of sanctions" and noting that, in early March 2020, Bittrex had emailed him regarding the License, but he had "failed to complete the process in due course"); 1/31/24 Tr. at 61:25–62:3 (Maria testimony).

[46] *See* AA-1256–58.

Order, but the record reflects that his account remained disabled due to incomplete and insufficient documentation.[47]

As of the Petition Date, the following types of cryptocurrencies remained in Mr. Arabpour's account: 0.00011914 BCH, 0.00011914 BTC, 109,389.6738 DOGE, 4,609.286 SC, 400 XRP, 42.71774955 ZEN.[48]  The balances associated with Mr. Arabpour's account total approximately $8,473.09 worth of active cryptocurrency tokens as of the Petition Date.[49]  Mr. Arabpour timely filed 10 proofs of claim seeking recovery in excess of $3,000,000 collectively from various Debtor entities.[50]  Mr. Arabpour's claims are predicated on his assertion that his cryptocurrency lost value and that he suffered other consequential damages because he was unable to withdraw his assets from Bittrex after his accounts were disabled in October 2017.

### 3.    Mr. Momenzadeh

Appellant Mr. Momenzadeh, an Iranian citizen, is also a cryptocurrency investor and trader. When Bittrex permitted Mr. Momenzadeh to open an account on its Exchange in January 2017, Mr. Momenzadeh provided BUS with an Iranian address.[51]  Mr. Momenzadeh asserts that, at the same time, he provided a copy of his Iranian passport and phone number.  (*See* D.I. 23 at 11.)  The Plan

---

[47] Des. Bankr. D.I. 554 at ¶ 22; Des. Bankr. D.I. 555 at ¶¶ 14, 18.  The driver's license issued by Turkey was deemed insufficient by Bittrex to allow Mr. Arabpour to withdraw his cryptocurrency from Bittrex because it did not show any sort of residential address in Turkey.  *See id.*  Mr. Arabpour contends that the driver's license issued by Turkey is a valid governmental document that demonstrated his residency in Turkey, but that Bittrex disregarded it and closed the support ticket without allowing him to present additional information.  (*See* D.I. 23 at 10.)

[48] Des. Bankr. D.I. 555 at ¶ 15.

[49] Des. Bankr. D.I. 555 at ¶ 17; BUS Bankr. 148 at ¶ 14.

[50] *See* Des. Bankr. D.I. 555 at ¶¶ 29–63.

[51] 2/9/24 Tr. at 13:11–16 (Maria testimony); Des. Bankr. 557 at ¶ 1.

Administrator does not dispute that BUS violated OFAC regulations by offering and providing services to Mr. Momenzadeh in January 2017.

In order to create a new account, Mr. Momenzadeh, like all new BUS customers, was required to click the box to accept the 2015 Terms of Service. The Plan Administrator testified that Mr. Momenzadeh would not have been able to access his account or make withdrawals without agreeing to the 2015 Terms of Service.[52]

In April 2017, Mr. Momenzadeh contacted BUS, asking whether it was "a problem from [BUS's] side" that he was an Iranian resident who would trade from his country.[53] BUS incorrectly reassured Mr. Momenzadeh that he could trade on Bittrex's platform but needed to complete enhanced verification.[54] Mr. Momenzadeh asserts that this reassurance came from Bittrex's co-founder and support director, Ryan Hentz and its CEO, William Shihara. (*See* D.I. 23 at 11.) In June 2017, Mr. Momenzadeh provided BUS with a copy of his Iranian passport but did not complete enhanced verification.[55]

Between April 25, 2017, and September 14, 2017, Mr. Momenzadeh successfully completed twenty-eight withdrawals of assets associated with his account. (BUS Bankr. D.I. 150 at 4.)

In October 2017, after receiving the Subpoena, Bittrex suspended the accounts of all customers that it identified as having ties to Iran and other sanctioned jurisdictions, including the account of Mr. Momenzadeh.[56] Around the time of his account suspension, Mr. Momenzadeh

---

[52] 2/9/24 Tr. at 12:21–13:4–10; 19:21–20:4, 20:12–18 (Maria testimony).

[53] D.I. 20 at 10.

[54] D.I. 20 at 10; 2/13/24 Tr. at 29:21–30:23 (Maria testimony); Des. Bankr. D.I. 557 at ¶ 1.

[55] Des. Bankr. D.I. 557 at ¶ 1.

[56] 2/9/24 Tr. at 13:19–20 (Maria testimony).

unsuccessfully tried to access Bittrex's platform using a VPN, and on November 12, 2018, Mr. Momenzadeh again tried to access Bittrex's platform using a VPN.[57]  In connection with these attempts, Mr. Momenzadeh accepted the 2018 Terms of Service, which relate to "any services made available by Bittrex, Inc. or Bittrex Malta Ltd . . . under the name of 'Bittrex International.'"[58]  Being a non-U.S. resident, Mr. Momenzadeh was transitioned to Malta OpCo, and became a Malta OpCo customer.[59]  The acceptance of the 2018 Terms of Service did not entail any transfer of assets between Bittrex entities.[60]

On September 26, 2019, OFAC issued the License, and starting in November 2019, BUS and Malta OpCo sent blast emails to "all the email addresses of anyone whose accounts had been disabled" informing all customers with an Iranian nexus—including Mr. Momenzadeh—that it had obtained the License and providing detailed instructions to withdraw assets before the License expired.[61]  Mr. Momenzadeh did not respond directly to any of the blast emails or attempt any activity in his account during the withdrawal period authorized by the License.[62]  The License expired on March 31, 2020, which ended the Debtors' legal authority to return assets to residents of Iran, including Mr. Momenzadeh.

---

[57] AA-1281–1375 (IP log); 2/9/24 Tr. at 19:7–20 (Maria testimony explaining IP log).

[58] BUS Bankr. D.I. 150 at ¶ 9.

[59] *Id.*; 1/31/24 Tr. at 46:7–47:22 (Maria testimony).

[60] 1/31/24 Tr. at 46:7–47:22 (Maria testimony).

[61] BUS Bankr. D.I. 150 at ¶ 11 (citing 1/16/24 Tr. at 91:13–20 (Maria testimony)).

[62] 1/31/24 Tr. at 64:3–14 (Maria testimony); 2/9/24 Tr. at 13:23–14:2–7 (Maria testimony) (in response to whether Mr. Momenzadeh took advantage of the OFAC License period, the Plan Administrator testified, "From what we can tell, he was not logging on during this period.  So, he did not try to withdraw his funds pursuant to the license process.").

In September 2022, Mr. Momenzadeh contacted the Debtors requesting access to his account for the purpose of withdrawing his cryptocurrencies.[63]  At that time, Mr. Momenzadeh provided the Debtors with documentation purporting to establish that he was now a resident of Turkey and should not be subject to OFAC sanctions.[64]  Customer service informed Mr. Momenzadeh that the deadline for withdrawals had passed and the account must remain suspended due to OFAC sanctions.[65]

Following the chapter 11 filing on May 8, 2023, the Bankruptcy Court issued the Customer Withdrawal Order.  Pursuant to that order, Mr. Momenzadeh again attempted to comply with the identification requirements.  However, the record reflects that his account remained disabled due to incomplete or insufficient documentation.[66]  Accordingly, Mr. Momenzadeh's cryptocurrency assets remained on the Debtors' Exchange.

As of the Petition Date, the following cryptocurrencies were in Mr. Momenzadeh's account: 0.1104 bitcoin (BTC).[67]  The balances associated with Mr. Momenzadeh's account total approximately $3,067.17 worth of active cryptocurrency tokens as of the Petition Date.[68]

---

[63] AA-1401–1428.

[64] *See id.*  Mr. Momenzadeh asserts he submitted these pictures of him holding his passport at three angles, inside and outside his apartment in Turkey, a residential rent contract, utility bills, and a residency card issued by the government of Turkey.  (*See* D.I. 23 at 12.)

[65] Des. Bankr. D.I. 557 at ¶ 5; AA-1401–1428.

[66] *See* 2/9/24 Tr. at 25:9–17 (Maria testimony); AA-1377; Des. Bankr. D.I. 557 at ¶¶ 5, 11. The residence permit, along with corresponding documentation, were deemed insufficient to allow Mr. Momenzadeh to withdraw his cryptocurrency because it did not show a residential address in Turkey.  Accordingly, Mr. Momenzadeh never successfully established that he was subsequently a resident of Turkey and should not be treated as a resident of Iran.  *See* 2/9/24 Tr. at 15:19–25 (Maria testimony) ("The problem was while doing this . . . he was logging in from IP addresses that did not match up with Turkish IP addresses.")

[67] Des. Bankr. D.I. 557 at ¶¶ 12–13.

[68] *Id.*

13

Mr. Momenzadeh timely filed 11 proofs of claims seeking recovery in excess of $2,200,000 collectively from various Debtor entities.[69]  His claims are predicated on his assertion that his cryptocurrency lost value and that he suffered other consequential damages because he was unable to withdraw his assets from Bittrex after his account was disabled in October 2017.

### D.    The Terms of Service

Both the 2015 Terms of Service and the 2018 Terms of Service, which provide for the application of Washington law,[70] (i) bar liability for incidental, consequential, and punitive damages; and (ii) limit all liability to 12 months of commissions preceding the event giving rise to the claim.[71]

---

[69] Des. Bankr. D.I. 556 at 1.

[70] *See* AA-942–43; AA-962–63.  Section 21 of the 2015 Terms of Service provides, in relevant part, that: "The laws of the State of Washington, excluding its conflicts of law rules, govern your access to and use of the Services and Bittrex Materials." (AA942–43.)  Section 19 of the 2018 Terms of Service provides: "With respect to any Tokens that are made available for trading by Bittrex Inc., the interpretation and enforcement of these Terms, and any dispute related to these Terms or the Services, will be governed by and construed and enforced in accordance with the laws of the State of Washington, without regard to conflict of law rules or principles (whether of Washington or any other jurisdiction) that would cause the application of the laws of any other jurisdiction." (AA-962.)

[71] Section 19 of the 2015 Terms of Service state:

> THE INDEMNIFIED PARTIES SHALL HAVE NO LIABILITY FOR, AND YOU RELEASE THE INDEMNIFIED PARTIES FROM, ALL DAMAGES, COSTS AND LIABILITIES ARISING FROM OR RELATED TO YOUR USE OR INABILITY TO USE THE SERVICES OR BITTREX MATERIALS, INCLUDING WITHOUT LIMITATION ANY DIRECT, INDIRECT, INCIDENTAL, CONSEQUENTIAL, ECONOMIC, SPECIAL OR PUNITIVE DAMAGES OR DAMAGES FOR LOSS OF DATA, EVEN IF AN INDEMNIFIED PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL THE AGGREGATE LIABILITY OF THE INDEMNIFIED PARTIES, WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE, WHETHER ACTIVE, PASSIVE OR IMPUTED), PRODUCT LIABILITY, STRICT LIABILITY OR OTHER THEORY, ARISING OUT OF OR RELATING TO THE USE OF OR INABILITY TO USE THE SERVICES AND/OR CONTENT EXCEED THE FEES PAID BY YOU TO BITTREX DURING THE 12 MONTHS IMMEDIATELY PRECEDING THE DATE OF ANY

CLAIM GIVING RISE TO SUCH LIABILITY. The foregoing disclaimer of warranties, disclaimer of certain damages and limitation of liability will apply to the maximum extent permitted by applicable law. The laws of some states or jurisdictions do not allow the exclusion of implied warranties or the exclusion or limitation of certain damages. To the extent that those laws apply to these Terms, the exclusions and limitations set forth above may not apply to you.

(AA-942.) Section 18 of the 2015 Terms of Service defines "Indemnified Parties" as follows: "Bittrex and our affiliates, independent contractors and service providers, and each of our respective officers, directors, members, employees, agents, and affiliates." (AA-942.)

Section 16 of the 2018 Terms of Service provides:

IN NO EVENT WILL BITTREX, INC., BITTREX MALTA, EACH OF THEIR RESPECTIVE AFFILIATES AND THEIR RESPECTIVE SHAREHOLDERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, AGENTS, REPRESENTATIVES, SUPPLIERS OR CONTRACTORS BE LIABLE FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OR LIABILITIES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF DATA, INFORMATION, REVENUE, PROFITS OR OTHER BUSINESS OR FINANCIAL BENEFIT) ARISING OUT OF OR IN CONNECTION WITHTHE SITE, THE SERVICES, THE BITTREX MATERIALS, ANY PERFORMANCE OR NON-PERFORMANCE OF THE SERVICES, OR ANY OTHER PRODUCT, SERVICE OR OTHER ITEM PROVIDED BY OR ON BEHALF OF BITTREX, WHETHER UNDER CONTRACT, STATUTE, STRICT LIABILITY OR OTHER THEORY (INCLUDING, FOR AVOIDANCE OF DOUBT, ANY NEGLIGENCE OF BITTREX), EVEN IF BITTREX HAS BEEN ADVISED OF THE POSSIBILITY OF ANY SUCH DAMAGES.

(AA-960–61.)

Section 17 of the 2018 Terms of Service states:

IN NO EVENT WILL THE LIABILITY OF BITTREX, INC., BITTREX MALTA, EACH OF THEIR RESPECTIVE AFFILIATES AND THEIR RESPECTIVE SHAREHOLDERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, AGENTS, REPRESENTATIVES, SUPPLIERS OR CONTRACTORS ARISING OUT OF OR IN CONNECTION WITH SITE, THE SERVICES, THE BITTREX MATERIALS, ANY PERFORMANCE OR NON-PERFORMANCE OF THE SERVICES, OR ANY OTHER PRODUCT, SERVICE OR OTHER ITEM PROVIDED BY OR ON

Further, both the 2015 Terms of Service and the 2018 Terms of Service: (i) prohibit Appellants from using Bittrex's platform while residing in Iran;[72] (ii) allow Bittrex to suspend Appellants' accounts in its sole discretion and without any liability to Appellants;[73] and (iii) permit Bittrex to delist uneconomic cryptocurrencies.[74]

---

BEHALF OF BITTREX, WHETHER UNDER CONTRACT, STATUTE, STRICT LIABILITY OR OTHER THEORY (INCLUDING, FOR AVOIDANCE OF DOUBT, ANY NEGLIGENCE OF BITTREX) EXCEED THE AMOUNT OF THE FEES PAID BY YOU TO BITTREX UNDER THIS AGREEMENT IN THE TWELVE-MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM FOR LIABILITY.

(AA-961.)

[72] Section 2.1 of the 2015 Terms of Service provides: "You represent and warrant that you: . . . are not located in, under the control of, or a national or resident of . . . any country to which the United States has embargoed goods or services." (AA-935.)

Section 2.2 of the 2018 Terms of Service provides:

You may not use the Services if you are located in, or a citizen or resident of any state, country, territory or other jurisdiction that is embargoed by the United States. . . . You represent and warrant that you are not a citizen or resident of any such jurisdiction and that you will not use any Services while located in any such jurisdiction, and that you are not on any trade or economic sanctions list. You also may not use the Services if you are located in, or a citizen or resident of, any other jurisdiction where Bittrex has determined, at its discretion, to prohibit use of the Services. Bittrex may implement controls to restrict access to the Services from any jurisdiction prohibited pursuant to this Section 2.2. You will comply with this Section 2.2, even if Bittrex's methods to prevent use of the Services are not effective or can be bypassed.

(AA-946.)

[73] AA-941 (Section 16); AA-956–57 (Sections 10.2 and 10.3).

[74] AA-937 (Section 4.7); AA-948–49 & AA-953–54 (Sections 4 and 8.3).

### E.   The Chapter 11 Plan

On October 31, 2023, the Bankruptcy Court entered an order (Des. Bankr. D.I. 517) (the "Confirmation Order") confirming the Debtors' plan of liquidation (Des. Bankr. D.I. 517-1) (the "Plan").  As the Bankruptcy Court explained, "[i]n simple terms, the Plan provides that customers can take back their cryptocurrency that is presently on the Debtors' Exchange."  *In re Bittrex*, 2024 WL 2347311, at *1 (citing Plan, Art. III.D.4).

On November 15, 2023 (the "Effective Date"), the Debtors filed a Notice of Effective Date. (Des. Bankr. D.I. 563).  As of the Effective Date, all assets defined as "Wind Down Assets" vested in the Wind Down Entity, and the Debtors appointed the Plan Administrator to manage the Wind Down Entity.  (*See* Des. Bankr. D.I. 517 at ¶¶ 17.G, 52.)

### F.   The Claims, Objections, and Responses

Appellants filed a total of thirty-four proofs of claim in an aggregate amount of $7,800,000, asserting claims for loss of value and profits resulting from the disabling of their accounts (the "Claims").  The Plan Administrator contends that Appellants' accounts were worth approximately $12,540 as of the Petition Date.

On November 13, 2023, the Plan Administrator filed objections to Appellants' Claims (Des. Bankr. D.I. 554–559) (the "Objections"), setting a related trial for December 13, 2023.  The Objections assert, among other things, that each of the Appellants accepted the 2015 Terms of Service, that two of the Appellants accepted the 2018 Terms of Service, and that both Terms of Service preclude any liability for incidental, consequential, or punitive damages; thus, the Terms of Service preclude damages based on Appellants' inability to access their assets on the Exchange while their accounts were disabled.  As set forth in the Objections, the Terms of Service further provide that Bittrex can suspend or terminate service for any reason, and that currencies can be delisted and taken off the Exchange.  The Objections further assert that Appellants' list of contract claims are barred by

the Terms of Service, and that their list of tort claims are barred by the three-year statute of limitations applicable under Washington law, as the suspension of Appellants' accounts all occurred in October 2017—long before May 8, 2020 (*i.e.*, the date that is three years prior to the Petition Date).

On November 27, 2023, one week prior to their deadline to respond to the Objections, Appellants each filed a short response and served the Plan Administrator with broad discovery requests. (AA-886–87 (Response of Mr. Arabpour); AA-894–95 (Response of Mr. Momenzadeh); AA-901–02 (Response of Mr. Abbasi) (together, the "Responses"); Des. Bankr. D.I. 616 (Mr. Momenzadeh's filing seeking to compel document production); Des. Bankr. D.I. 632, Ex. B, C, & D (attaching Appellants' discovery requests).) Appellants' primary response to the Objections was lack of discovery. Each Appellant also noted his withdrawal of duplicate claims.

With respect to the Terms of Service, Mr. Abbasi's Response states: "I have not accepted any terms other than those of the Terms of service dating version 2015 with Bittrex LLC. As a result, any objections raised by the debtors are null and void because they cannot impose on me the terms of service for which I was not eligible and did not have eligibility." (AA-902.) "I object to all other points raised by the debtor's counsel and will defend my rights accordingly." (*Id.*)

Mr. Arabpour's Response further asserts that he submitted sufficient documentation, including his "passport, a rental contract from Turkey, and a Turkish driving license," but "Bittrex refused to activate my account and grant me withdrawal permissions." (AA-886–87.) With respect to the Terms of Service, Mr. Arabpour states: "I only agreed to the 2015 version of the Terms of Service with Bittrex LLC. Therefore, any objections raised by the debtors are irrelevant because they cannot compel me to accept terms for which I was not eligible and did not fulfill the requirements. I object to everything stated by the debtor's attorney and will defend my rights." (*Id.*)

Mr. Momenzadeh's Response cites Bittrex's reassurance that despite being a resident of Iran, he was permitted to be a customer. (AA-895.) Mr. Momenzadeh asserts that he provided his

"passport, a rental agreement from Turkey, and a utility bill from Turkey, yet Bittrex declined to enable my account and grant me withdrawal permissions." (*Id.*)  With respect to the Terms of Service, Mr. Momenzadeh states: "I only agreed to the 2015 version of the Terms of Service with Bittrex LLC. So, any complaints by the debtors don't count because they can't force me to accept terms I wasn't qualified for and didn't meet the requirements. (*Id.*)  "I disagree with everything the debtor's lawyer says and will stand up for my rights." (*Id.*)

The Plan Administrator filed a motion for a protective order limiting the Debtors' document productions to the customer support tickets and specific account balances (Des. Bankr. D.I. 631, 632.) On December 13, 2023, the Bankruptcy Court granted the protective order.  (Des. Bankr. D.I. 779.) At the related hearing, the Bankruptcy Court continued the trial on the Objections to Appellants' Claims, which was later scheduled for January 31, 2024.[75]

### G.    The Trial

The entire trial was conducted with a translator for the benefit of Appellants.  On January 31, 2024, the Plan Administrator gave direct testimony regarding Appellants' opening of accounts, acceptance of the 2015 Terms of Service, the Subpoena, the License, and communications with Appellants, and various supporting documents were admitted into evidence.[76]  On February 9, 2024, the trial resumed, and the Plan Administrator completed his direct testimony in support of the Objections.  Mr. Abbasi cross-examined the Plan Administrator, and Mr. Arabpour began his cross-examination.[77]  On February 13, 2024, Mr. Arabpour concluded his cross-examination of the Plan

---

[75] 12/13/23 Tr. at 73.

[76] 1/31/24 Tr. at 8:5–13 (listing exhibits); 8:5–15:22 (Debtors' opening remarks); 34:13–64:14 (Maria direct testimony)

[77] 2/9/24 Tr. at 7:8–35 (Maria direct testimony); *id*. at 36:20–99:1 (cross-examination by Mr. Abbasi); *id*. at 100:2–110:15 (cross-examination by Mr. Arabpour).

Administrator, Mr. Momenzadeh cross-examined him, and each of the Appellants gave a statement and was each cross-examined.[78]  During the trial, Mr. Abbasi and Mr. Arabpour raised the argument that, because Bittrex was prohibited from providing services to residents of Iran, the Terms of Service were "illegal," "null and void," and "unenforceable."[79]

On May 23, 2024, the Bankruptcy Court issued the Memorandum Orders sustaining the Objection to Appellants' Claims for damages, based on its determinations, *inter alia*, that the Terms of Service, including disclaimers of damages and limitations on liabilities, are clear and enforceable under Washington law, precluding Appellants' claims for incidental, consequential, and punitive damages.  The Bankruptcy Court held that Appellants' "claims for lost profits and various other categories of damages were expressly waived under [the Terms of Service], which operate to disclaim damages and otherwise effectively limit the Debtor's liability."  (BUS Bankr. D.I. 148 ¶ 47; BUS Bankr. D.I. 149 ¶ 32; BUS Bankr. D.I. 150 at ¶ 30).  On June 5, 2024, the Bankruptcy Court entered the related Orders.

### H.    The Appeals

On June 17, 2024, Appellants filed timely Notices of Appeal with respect to each of the Orders.  On July 22, 2024, the three appeals were consolidated on consent of the parties.  (D.I. 5.)  The parties agree that a proper statement of the issue on appeal includes whether the Bankruptcy Court erred in sustaining the Debtors' Objections to Appellants' Claims.  (*See* D.I. 7, 8, 9; D.I. 20 at 3.)  Appellants identified several additional and overlapping issues:

1. **Whether the Bankruptcy Court erred in finding and concluding as a matter of law that:** (a) the Terms of Service apply to the Claims; (b) the Terms of Service are

---

[78] 2/13/24 Tr. at 9:23–28:18 (continued cross-examination by Mr. Arabpour); *id*. at 29:20–40:15 (cross-examination by Mr. Momenzadeh); *id*. at 44:14–57:20 (Mr. Arabpour); *id*. at 58:7–65:17 (testimony by Mr. Momenzadeh); *id*. at 66:3–77:20 (testimony by Mr. Abbasi).

[79] *See* 2/9/24 at 43:23–44:2 (Mr. Abbasi); 2/13/24 Tr. at 45:21–23 (Mr. Arabpour); *id*. at 68:25–69:16 (Mr. Abbasi).

enforceable against each Appellant; (c) the Debtors did not breach the Terms of Service; (d) Appellants' claims of negligence, negligent misrepresentation, conversion, fraud, breach of fiduciary duty, unjust enrichment, negligent or intentional emotional distress, civil conspiracy, breach of the implied duty of good faith and fair dealing, lost profits, and breach of contract are time-barred; (e) Appellants' tort claims fail under the State of Washington's independent duty doctrine; and (g) Appellants failed to carry the burden of supporting their Claims by a preponderance of the evidence;[80]

2. **Whether the Bankruptcy Court erred in failing to find, or failing to conclude as a matter of law, that:** (a) application of the discovery rule saved Appellants' time-barred Claims; (b) Debtors' willful conduct, illegal actions, gross negligence, or reckless disregard rendered void the waivers and exculpatory clauses in the Terms of Service; (c) the waivers and exculpatory clauses in the Terms of Service are unconscionable, against public policy, and void; (d) the 2018 Terms of Service do not govern the relationship with any Appellant; (e) the transfer of Appellants' blocked assets from Bittrex Inc. to Bittrex Malta Ltd. was void and null as a matter of law; (f) Bittrex's blocking of Appellants' assets and disabling of their accounts was in violation of U.S. rules and regulations; (g) Bittrex had knowledge that providing service to residents of Iran was a violation of U.S. rules and regulations; (h) BlockScore services were not necessary for the purpose of compliance with OFAC rules and regulations; and (i) Appellants raised their argument that the Terms of Service were null and void as illegal in their submissions prior to trial on the Claim Objections.

(*See* D.I. 7, 8, 9.)  On October 10, 2024, the appeals were fully briefed.[81]  (D.I. 18, 20, 23.)  The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

## III.   JURISDICTION AND APPLICABLE STANDARDS

District courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and

---

[80] Appellants also assert that the Bankruptcy Court erred in failing to conclude that Bittrex's actions violated Revised Code of Washington ("RCW") § 19.86.020.  (*See* D.I. 7, 8, 9.)  That statue provides: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  Violation of that statute was not asserted in Appellants' Claims or Responses, nor was it mentioned in the Memorandum Orders. The Court does not consider it here.

[81] On February 25, 2025, following completion of briefing, Appellants filed a motion seeking to further consolidate the these already consolidated appeals with another appeal pending at Civ. No. 24-686-JLH.  (*See* D.I. 31.)  As the consolidated appeals are already fully briefed, there is no good reason to further consolidate them with another separate appeal, and Appellants' request will be denied.

decrees." 28 U.S.C. § 158(a)(1). "An order allowing or disallowing a claim is a final, appealable order." *In re Prosser*, 388 F. App'x 101, 102 n.1 (3d Cir. 2010) (quoting *Orsini Santos v. Mender*, 349 B.R. 762, 768 (1st Cir. BAP 2006)). This Court reviews the Bankruptcy Court's legal determinations *de novo,* its factual findings for clear error, and its exercise of discretion for abuse thereof. *In re Amer. Pad & Paper Co*., 478 F.3d 546, 551 (3d Cir. 2007).

The Debtors objected to the Claims under 11 U.S.C. § 502(b)(1), which provides that a court will disallow a claim to the extent it is unenforceable under applicable law. *See In re Combustion Eng'g, Inc*., 391 F.3d 190, 245 n.66 (3d Cir. 2004). As the Bankruptcy Court correctly explained in the Memorandum Orders, the burden of proof for a claim filed in a bankruptcy proceeding "rests on different parties at different times." *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). Initially, the claim holder must establish the prima facie validity of the claim. Bankruptcy Rule 3001(f) provides that a proof of claim executed and filed in accordance with the rules of procedure (*i.e.*, includes the facts and documents necessary to support the claim), constitutes prima facie evidence of the validity and amount of the claim. Fed. R. Bankr. P. 3001(f); *In re Samson Res. Corp*., 569 B.R. 605, 615 (Bankr. D. Del. 2017); *In re F-Squared Inv. Mgmt., LLC*, 546 B.R. 538, 543 (Bankr. D. Del. 2016) ("Because a properly filed proof of claim is treated not merely as a document containing arguments and assertions, but as evidence that sufficiently supports its claims, a proof of claim that is filed 'in accordance' with Bankruptcy Rule 3001 serves to satisfy the claimant's initial burden of production.") The claim objector must then produce evidence that, "if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *Allegheny*, 954 F.2d at 173. At that point, the burden shifts back to the claim holder to provide the validity of the claim by a preponderance of the evidence. *Id*. at 174. The ultimate burden of persuasion rests on the claim holder. *In re Samson Res.*, 569 B.R. at 615.

Finally, each Appellant "proceeds *pro se*, and accordingly, we construe his pleadings

liberally." *See Laughlin v. Peck,* 552 Fed. App'x 188, 190 (3d Cir. 2014) (citing *Haines v. Kerner,* 404 U.S. 519, 520–21 (1972)). While parties appearing *pro se* are afforded a greater degree of leniency and their pleadings are held to "less stringent standards than formal pleadings drafted by lawyers," *pro se* litigants must still "abide by the same rules that apply to all other litigants." *See Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244–45 (3d Cir. 2013).

## IV.    THE PARTIES' CONTENTIONS

The crux of Appellants' challenge to the disallowance of their Claims is that Bittrex knowingly permitted residents of Iran to become customers to increase their commissions.[82] Appellants' frustration with the Debtors' past failure to comply with regulations, as well as their attempts to navigate the complex chapter 11 process without counsel, is evident from their briefs. What is not evident from the briefing are the specific findings or conclusions that Appellants seek to challenge on appeal. Construing their briefs liberally, Appellants appear to challenge the Bankruptcy Court's determination that they are bound by the Terms of Service, which Appellants argue are void and unenforceable as contrary to Washington (and U.S.) law. (D.I. 18 at 5, 10, 15–16, 21–22, 26–27.) Appellants further argue that they are not bound by the Terms of Service (*see id.* at 15–21) because the terms are not comprehensible (*see id.* at 26–27) and do not specifically address the situation where, as here, Bittrex refused to return and/or refund a customer's assets (*see id.* at 29–30). Appellants further contend that the exculpatory clauses contained in the Terms of Service are unconscionable and unenforceable. (*See id.* at 30–36.) Finally, Appellants assert that their claims are not time-barred under Washington law under a proper application of the doctrine of continuing wrongs, equitable tolling, and/or the discovery rule. (*See id.* at 10–11, 36–40.)

According to the Plan Administrator, certain issues identified for appeal were either never

---

[82] *See* D.I. 18 at 2–5.

raised by Appellants before the Bankruptcy Court or raised only in passing reference.[83]  (*See* D.I. 20 at 17–18.)  Additionally, the Plan Administrator asserts that Appellants failed to present any argument in support of certain issues in their opening brief.[84]  (*See id*. at 18.)  Even assuming these issues were properly raised, the Plan Administrator asserts, the Bankruptcy Court did not err in holding that the Terms of Service are valid and enforceable, including their disclaimers of damages and limitations on liabilities.  The Plan Administrator further asserts that, even if the Terms of Service were unenforceable, Appellants' tort claims for conduct predating May 8, 2020 (*i.e.*, three years from the Petition Date) are barred by the applicable statutes of limitations under Washington law, and for conduct postdating May 8, 2020, those claims are barred under Washington's independent duty doctrine.

In their reply to the Plan Administrator's arguments that Appellants have failed to preserve certain issues for appeal, Appellants argue that they have done their best to present their claims as *pro se* foreign appellants but point to no place in the record where those arguments were raised.  (*See* D.I. 23 at 15.)  Although the Third Circuit construes *pro se* filings liberally, "that policy has not prevented [Courts] . . . from applying the forfeiture doctrine to pro se appeals."  *Biear v. Att'y Gen. United States*, 2024 WL 837039, at *1 (3d Cir. Feb. 28, 2024).

---

[83] These include Appellants' arguments that: (i) the Terms of Service, including their exculpatory clauses, are unconscionable; (ii) the exculpatory clauses violate Washington law; (iii) the Terms of Service are not sufficiently clear and thus unenforceable; (iv) the Terms of Service do not govern matters relating to the return/refund of assets to customers; (v) the Debtors are liable pursuant to Washington's Consumer Protection Act ("CPA"); (vi) Appellants' tort claims are not time-barred based on the discovery rule and the continuous tort and equitable tolling doctrines; (vii) the independent duty doctrine does not apply; and (viii) the Debtors are liable based on one or more of the causes of actions that Appellants merely listed in their Claims and never properly developed before the Bankruptcy Court.  (*See* D.I. 20 at 17–18.)

[84] These include: Appellants' arguments that (i) the independent duty doctrine does not apply; (ii) the elements for holding the Debtors liable under one or more of the causes of action included in Appellants' Claims are met; and (iii) the Debtors are liable pursuant to Washington's CPA.

## V.    ANALYSIS

Even if the arguments identified by Appellants were properly raised below and preserved for appeal, they do not support reversal of the Orders.

### A.    Appellants Present No Basis to Conclude that the Terms of Service Are Void

The record reflects that both the 2015 and 2018 Terms of Service (i) bar liability for incidental, consequential, and punitive damages; and (ii) limit all liability to 12 months of commissions preceding the event giving rise to the claim.  (AA-942; AA-960–61.)  Under the Terms of Service, Bittrex could suspend Appellants' account for any reason, including Appellants' breach of the Terms of Service, without incurring liability for consequential damages.  (AA-941; AA-956–57.)  For example, Section 16 of the 2015 Terms of Service states:

> In the event of any Force Majeure Event (as defined in Section 22.3), breach of these Terms, or any other event that would make provision of the Services commercially unreasonable for Bittrex, we may, in our discretion and without liability to you, with or without prior notice, suspend your access to all or a portion of our Services. We may terminate your access to the Services in our sole discretion, immediately and without prior notice, and delete or deactivate your Bittrex account and all related information and files in such account without liability to you, including, for instance, in the event that you breach any term of these Terms.... Further, we may, in our sole discretion and without liability to you, with or without prior notice and at any time, modify or discontinue, temporarily or permanently, any portion of our Services.

(AA-941.)  Similarly, Section 4.1 of the 2015 Terms of Service provides that Bittrex "may, at any time and in [its] sole discretion, . . . impose any . . . conditions or restrictions upon your use of the Services, without prior notice."  (AA-937; AA-948–49 & AA-953–54.)  The record also reflects that Section 4 of the 2018 Terms of Service lists several risks—including potential devaluation of account assets, any kind of losses, inability to receive financial benefits available to other customers, and restrictions to the account—that may materialize because of cryptocurrencies becoming defunct/delisted or governmental actions (such as the OFAC sanctions): "The risks described in this

25

Section 4 may result in loss of Tokens, decrease in or loss of all value for Tokens, inability to access or transfer Tokens, inability to trade Tokens, inability to receive financial benefits available to other Token holders, and other financial losses to you." (AA-950.)

Appellants do not challenge the Bankruptcy Court's determination that their Claims for lost profits and various other categories of damages are precluded under the Terms of Service, which disclaim damages and otherwise effectively limit the Debtor's liability. Rather, they argue that they are not bound by the Terms of Service because any such agreement is void, illegal, or otherwise unenforceable. Even if these arguments are properly before this Court,[85] the Court finds no basis to conclude that the Terms of Service are void under Washington law. The Terms of Service do not require the performance of illegal acts, and they contain provisions that *require* compliance with United States law. (*See* AA-935–36 (Section 2.1); AA-946 (Section 2.2).) *Hall v. Anderson*, 18 Wash. 2d 625, 635 (Wash. 1943) (a contract that contains no illegal provisions on its face and that does not require "performance of acts corrupt in themselves" is not void as a matter of law). As Appellants acknowledge, "the content of Terms of Service is not void facially." (D.I. 18 at 26.)

---

[85] The Debtors argue that this issue was not raised in the Bankruptcy Court until the trial, which began on January 31, 2024. (*See* 2/13/24 Tr. at 45:21–23 (Mr. Arabpour); *id*. at 68:25–69:6 (Mr. Abbasi).)

Mr. Abbasi argues that he raised the issue in his Response to the Objection, but the Response states: "I have not accepted any terms other than those of the Terms of service dating version 2015 with Bittrex LLC. As a result, any objections raised by the debtors are null and void because they cannot impose on me the terms of service for which I was not eligible and did not have eligibility." (AA-902).

The Court notes that at the hearing on the Plan Administrator's motion for a protective order, held before the start of the trial, Mr. Arabpour stated that "the contracts are unenforceable because I didn't sign them as expressed in the debtor's objection to my claims. I was resident of a sanction country providing services to me and in (indiscernible) with a US entity was forbidden by laws. Thus, such contracts are against US law and are unenforceable." (12/13/23 Tr. at 61:1–6). The Court finds no other references to this argument in the record, and Appellants cite none.

**B.      Appellants Accepted the Terms of Service**

The records supports the finding that each of Appellants agreed to the 2015 Terms of Service by checking the box to accept those Terms of Service.  As the Bankruptcy Court explained in the Memorandum Orders, "a reasonable user would know that by clicking the registration button, he was agreeing to the terms and conditions accessible via the hyperlink, whether he clicked on the hyperlink or not."  *See*, *e.g.*, BUS Bankr. D.I. 148 (citing *Meyer v. Uber Techs, Inc.*, 868 F.3d 66, 74–75, 79–80 (2d Cir. 2017); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016)).  *See also Hauenstein v. Softwrap Ltd.*, 2007 WL 2404624, at *3 (W.D. Wash. Aug. 17, 2007) ("Here, [p]laintiff had to register, and agree to the terms of the contract before he could ever use [defendant's] products.  Plaintiff's assent to the terms of the License Agreement, manifested through his 'clicking' the 'I agree' button, binds him [under Washington law] to the terms of the License Agreement.").

**C.      The Exculpatory Clauses Are Enforceable**

Appellants assert that they never accepted the 2018 Terms of Service.  The Court need not reach the issue of whether each Appellant accepted the 2018 Terms of Service, as each Appellant accepted the 2015 Terms of Service, including their disclaimers of damages and limitations on liabilities (the "Exculpatory Clauses").

Assuming Appellants preserved for appeal any arguments relating to the unconscionability of the Exculpatory Clauses contained in the 2015 Terms of Service,[86] Appellants have failed to meet the high bar for showing that the Exculpatory Clauses render the contract unconscionable.  *Huang v.*

---

[86] In the *Memorandum Orders*, the Bankruptcy Court noted that Appellants claimed that 2015 Terms of Service were "inconspicuous" or "violated public policy" under Washington law.  (*See* BUS D.I. 148–50.)  The record reflects that Appellants made no more than a cursory reference to these issues before the Bankruptcy Court.  Moreover, Appellants never properly raised and developed these issues before their opening brief.  (*See* D.I. 18 at 9–10, 19, 33–36.)

*Wash. Mut. Bank,* 2008 WL 4103918, at *4 (W.D. Wash. Aug. 25, 2008) ("[T]he burden of proving that a contract or a contract clause is procedurally or substantively unconscionable lies upon the party attacking the contract."); *see Yakima Co. Fire Protection Dist. No. 12 v. City of Yakima*, 122 Wash.2d 371, 391 (Wash. 1993).

Under Washington law, procedural unconscionability is the lack of meaningful choice, considering all the circumstances surrounding the transaction, including the manner in which the contract was entered, whether each party had a reasonable opportunity to understand the terms of the contract, and whether the important terms were hidden in a maze of fine print. *See Sammy Enterprises v. O.P.E.N. Am., Inc.*, 2008 WL 2010357, at *3 (Wash. App. May 12, 2008); *Zuver v. Airtouch Commc'ns, Inc.*, 153 Wash. 2d 293, 304 (Wash. 2004). Here, the Exculpatory Clauses are conspicuous; they are set out in all caps with bolded headings, and "[are] not hidden in a maze of fine print." *Puget Sound Fin., L.L.C.*, 146 Wash. 2d at 442. The language of the Exculpatory Clauses, which encompass and disclaim liability relating to Appellants' inability to use the Bittrex platform to withdraw the assets in their accounts, is also clear. *See Zuver*, 153 Wash. at 306 (noting that a contract is not procedurally unconscionable when an average person can understand its terms). Finally, Appellants had a reasonable opportunity to understand the exculpatory clauses contained in Terms of Service. That Appellants did not negotiate the Terms of Service with Bittrex does not render the Terms of Service and their Exculpatory Clauses unconscionable, as Appellants had the opportunity to review and understand the Terms of Service before agreeing to them, and Bittrex did not impose any time constraints or other forms of pressure to force Appellants' acceptance. *Huang,* 2008 WL 4103918, at *5.

Substantive unconscionability exists when a clause or term in the contract is one-sided, overly harsh, or includes a gross disparity. *Huang,* 2008 WL 4103918, at *4. As the Plan Administrator correctly asserts, Courts reserve this label for contract terms that they consider to be "shocking to the

conscience," "monstrously harsh,'" and "exceedingly calloused." *See id.* Exculpatory clauses, even if one-sided, do not automatically meet this standard and are regularly found to be enforceable. *Cf. Yuille v. Uphold HQ Inc.*, 2023 WL 5206888, at *18 (S.D.N.Y. Aug. 11, 2023) (noting "[t]here is nothing inherently suspect about a limitation of liability clause," and finding no substantive unconscionability in a cryptocurrency exchange's limitation of liability for injury as a result of use of its platform). Here, Appellants had the opportunity to utilize the services of another cryptocurrency exchange (or to avoid purchasing/trading cryptocurrency altogether) if they disagreed with the Terms of Service. *See Riley v. Iron Gate Self Storage*, 198 Wash. App. 692, 712 (Wash. App. 2017) (finding exculpatory clause was not substantively unconscionable when plaintiff had the choice to take his business elsewhere if he disagreed with the agreement). Indeed, the record reflects that Appellants had access to other cryptocurrency exchanges and utilized them.[87]

In sum, the Court agrees that the Exculpatory Clauses are enforceable under Washington law because they are clear, conspicuous, and each of the Appellants had a reasonable opportunity to understand their terms, which are not contrary to public policy.

### D.    Tort Claims Arising Prior to May 8, 2020

Appellants' Claims assert a litany of torts. (AA-888, AA-896, AA-903.) As an initial matter, Appellants' Claims and Responses did not articulate the elements of these causes of action, or attempt to show how the facts satisfied those elements; nor do Appellants' briefs on appeal. At their core, however, the Claims are based on Appellants' contention that Bittrex should not have disabled their accounts in October 2017 and that Bittrex should have permitted Appellants to withdraw cryptocurrencies at their request. As set forth in the Objections, Washington law applies to

---

[87] *See, e.g.*, AA-1125 (showing that Mr. Abbasi withdrew his account assets to transfer them to Coindcx); AA-1248 (showing that Mr. Arabpour aimed to withdraw his assets to Binance).

Appellants' tort claims under the choice-of-law provisions in the Terms of Service.[88]  Washington law also applies pursuant to ordinary conflict of laws principles because Bittrex's principal place of business was in Washington at all relevant times.[89]  For each of these causes of action, Washington sets the statute of limitations at three years.  Appellants' Claims, based on alleged damages arising from the suspension of their accounts in October 2017, accrued long before May 8, 2020 (*i.e.*, three years before the May 8, 2023 Petition Date).  Any of the following claims arising before May 8, 2020 are thus time-barred: (1) negligence or negligent misrepresentation, (2) conversion, (3) fraud, (4) breach of fiduciary duty, (5) unjust enrichment, (6) personal injury and negligent or intentional emotional distress, (7) breach of implied covenant of good faith and fair dealing, and (8) civil conspiracy.[90]  Thus, even if these claims could exist in the face of a binding contract, which they

---

[88] AA-942–43 (Section 21); AA-962–63 (Section 19).

[89] *See, e.g.*, *In re Am. Metrocomm Corp.*, 274 B.R. 641, 659–60 (Bankr. D. Del. 2002) (citing the Restatement (Second) Conflict of Laws, stating that "with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation," and holding that the parties' most significant contacts were in Louisiana, where the debtor had its principal place of business, or where the parties performed the contract).  Appellants' references to New York cases are misplaced.  (*See* D.I. 18 at 37.)

[90] First, any claim for negligence or negligent misrepresentation expires after a three-year limitations period, which begins to run when the plaintiff has the right to seek relief in court.  *Sabey v. Howard Johnson & Co.*, 5 P.3d 730, 739 (Wash. Ct. App. 2000) (citing RCW § 4.16.080(2), (4)).  Second**,** any claim for conversion must be brought within three years after the cause of action accrues.  *Crisman v. Crisman*, 931 P.2d 163, 165 (Wash. Ct. App. 1997) (citing RCW § 4.16.080(2)).  Third, any claim for fraud has a limitations period of three years.  RCW §§ 21.20.430(4)(b), 4.16.080(4); *Young v. Savidge*, 230 P.3d 222, 230 (Wash. Ct. App. 2010); *Ives v. Ramsden*, 174 P.3d 1231, 1239 (Wash. Ct. App. 2008).  The limitations period starts to run when the aggrieved party discovers, or through reasonable diligence should have discovered, facts constituting the fraud.  RCW § 4.16.080(4); *Ives*, 174 P.3d at 1239.  Fourth, any claim for breach of fiduciary duty has a limitations period of three years.  *Mayer v. Huesner*, 107 P.3d 152, 156 (Wash. Ct. App. 2005) (citing RCW § 4.16.080(2)).  Fifth, any claim for unjust enrichment has a limitations period of three years.  *Davenport v. Wash. Educ. Ass'n*, 197 P.3d 686, 704 (Wash. Ct. App. 2008) (citing RCW § 4.16.080(3)).  Sixth, any claim for personal injury and negligent or intentional emotional distress has a limitations period of three years.  *St. Michelle v. Robinson*, 759 P.2d 467, 470 (Wash. Ct. App. 1988).  The general rule is that such a "cause of action 'accrues' at the time the act or omission occurs."  *Gevaart v. Metco Const., Inc.*, 111 Wash. 2d 499, 501 (Wash. 1988).  Seventh, any claim of civil conspiracy has a limitations period of three years.  *City of Seattle v. Blume*, 947 P.2d at 226

cannot in light of the applicable Terms of Service, the applicable statutes of limitations bar their assertion now.

Appellants refer to the "discovery rule,"[91] but that rule does not help them. Pursuant to the discovery rule, "a cause of action accrues when the plaintiff, through the exercise of due diligence, knew or should have known the basis for the cause of action." *Green v. A.P.C.*, 86 Wash. App. 63, 66 (Wash. Ct. App. 1997), *aff'd and remanded*, 136 Wash. 2d 87 (Wash. 1998). Appellants knew in 2017 that their accounts were suspended and that such suspension was due to OFAC sanctions.[92] Not only that, starting in November 2019, Bittrex sent blast emails to affected customers, including Appellants, informing them of the OFAC License that would have allowed the release of funds.[93]

Appellants next argue that Bittrex's "ongoing illegal conduct," "such as repeatedly failing to return the assets despite multiple requests" satisfies the "continuing wrong doctrine" and "might toll

---

(citing RCW § 4.16.080(2)). Eighth, any claim for breach of an implied covenant of good faith and fair dealing has a limitations period of six years if "the implied duty arises out of a written agreement." *Khalid v. Microsoft Corp.*, 2020 WL 6037123, at *7 (Wash. Ct. App. Oct. 12, 2020) (citing RCW § 4.16.040). To the extent any such claim is a contract claim based on the parties' contractual relationship under the Terms of Service, Appellants expressly disclaimed consequential or special damages when they accepted the Terms of Service. To the extent their claim has some other basis, the applicable statute of limitations is three years. *Khalid,* 2020 WL 6037123, at *7 (citing RCW § 4.16.080(3)).

[91] Appellants have mentioned this argument only in passing and do not support it by a preponderance of the evidence. (*See* D.I. 18 at 11–12, 38, 43.)

[92] *See, e.g.*, AA-1192–1202 (showing Mr. Arabpour attempted to login to his account by use of a VPN a few days after his account was disabled in October 2017 and consistently did so in the following months); AA-1033 (starting from early November 2017, Mr. Abbasi repeatedly attempted to log onto his account via a VPN showing that he was logging in from non-OFAC sanctioned countries); AA-1116 (in February 2019, Mr. Abbasi asked Bittrex to have his account released, but Bittrex denied his request by explaining to him that "[f]ederal economic sanctions prohibits U.S. companies from engaging in economic transactions with the residents of … Iran."); AA-1250–51, AA-1129 (Mr. Arabpour: "my account has been frozen for years because of sanctions").

[93] 1/31/24 Tr. at 41:17–22 (Maria testimony that starting in November 2019, blast emails were sent to all affected customers to inform them that the OFAC License allowed the return of the cryptocurrencies in their accounts).

the statute of limitations."  (D.I. 18 at 37.)  A continuing tort is "one where no single incident in a continuous chain of tortious activity can fairly or realistically be identified as the cause of significant harm."  *Haley v. Amazon.com Services, LLC*, 25 Wash. App. 2d 207 (Wash. Ct. App. 2022) (citations and internal marks omitted).  Importantly, a continuing tort is "occasioned by continual unlawful acts, not by continual ill effects from an original violation."  *Dunn v. City of Seattle*, 420 F. Supp. 3d 1148, 1162, 1163 (W.D. Wash. 2019).  Here, the alleged causes of harm all derive from the single act of Bittrex disabling Appellants' accounts in October 2017.  In any event, Washington courts do not apply the continuing tort doctrine to uphold claims that do not relate to real property (*e.g.*, trespass, nuisance) or employment discrimination claims, and they have declined to extend this doctrine beyond those contexts.  *See Vance v. Pierce*, 190 Wash. App. 1026 (Wash. Ct. App. 2015) ("[N]o Washington court has applied the continuing tort doctrine outside of property claims (trespass, nuisance, etc.) and employment discrimination claims."); *Dunn*, 420 F. Supp. 3d at 1162–63 (same).

Appellants also contend that they are entitled to equitable tolling because they are residents of Iran without access to lawyers or a financial system to pay legal fees, including attorney fees, which are circumstances beyond their control.  Even if Appellants had preserved that argument by raising it in the Bankruptcy Court, the circumstances cited by Appellants do not entitle them to equitable tolling.  *Fowler v. Guerin*, 200 Wash. 2d 110, 125 (Wash. 2022) ("A plaintiff seeking equitable tolling of the statute of limitations in a civil suit must demonstrate that such extraordinary relief is warranted because (1) the plaintiff has exercised diligence, (2) the defendant's bad faith, false assurances, or deception interfered with the plaintiff's timely filing, (3) tolling is consistent with (a) the purpose of the underlying statute and (b) the purpose of the statute of limitations, and (4) justice requires tolling the statute of limitations.").

E.    **Claims for Torts Arising After May 8, 2020**[94]

To the extent that Appellants' tort-based claims are based on facts that occurred after May 8, 2020 (*i.e.*, tort claims that would not have expired by the Petition Date), such claims are precluded by Washington's independent duty doctrine.  The independent duty doctrine prohibits a party to a contract from bringing tort claims against another party to the contract unless the former can prove the latter breached a tort duty arising independently of the terms of the contract.  *Olympic Tug & Barge, Inc. v. Lovel Briere LLC*, 668 F.Supp.3d 1165, 1176 (W.D. Wash. 2023) (dismissing conversion claim based on independent duty doctrine).  To the extent that duties are assumed by parties in a contract, a contracting party cannot raise tort claims based on those same duties.  *Mansur Props. LLC v. First Am. Title Ins. Co.*, 635 F. Supp. 3d 1116, 1126–27 (W.D. Wash. 2022) (dismissing negligence claim based on independent duty doctrine).

Here, the Terms of Service which govern the parties' relationship disclaim damages and permit account suspension.[95]  Appellants' Claims for conduct post-May 8, 2020 are premised on the allegation that Bittrex wrongfully refused to allow Appellants to withdraw cryptocurrencies.  Appellants have not asserted (or proved) any duty independent of the Terms of Service.  Accordingly, the independent duty doctrine bars Appellants' claims that are predicated on Bittrex's refusal to permit Appellants to withdraw cryptocurrencies after May 8, 2020.

Moreover, Appellants failed to allege or prove any facts to support liability for Bittrex's conduct after May 8, 2020.  It is undisputed that when Mr. Arabpour contacted Bittrex in June 2020, July 2020, and April 2021 to request the release of the assets in his account, Mr. Arabpour

---

[94] One of the issues identified in Appellants' Statements of Issues is whether "Appellants' tort claims fails under Washington's independent duty doctrine" (D.I. 7–9), but Appellants develop no related argument in their opening brief.  (*See* D.I. 18.)

[95] *See* AA-936, AA-941 (Sections 4.1, 16); AA-947–48, AA-953, AA-956 (Sections 3.3, 8.1, 10.2).

acknowledged that he "failed to complete the [License's] process in due course."[96]  As a result, the License expired and Bittrex could not authorize Mr. Arabpour's request for withdrawal because the latter resided in Iran.[97]  In November 2022, he again sought to withdraw the assets in his account, representing for the first time that he resided in Turkey.[98]  Bittrex could not comply with Appellant's request because he failed to complete the verification process establishing that he resided outside of Iran.[99]  After 2017, Mr. Momenzadeh requested that Bittrex provide access to his account only once: in September 2022.[100]  In connection with this request, Mr. Momenzadeh provided Bittrex with documentation purporting that he had become a resident of Turkey.[101]  Nevertheless, his account remained disabled because Mr. Momenzadeh did not complete Bittrex's verification process to prove that he no longer resided in Iran.[102]  Thus, after May 8, 2020, Mr. Arabpour and Mr. Momenzadeh could not withdraw the assets associated with their accounts because they failed to complete the process to allow Bittrex to verify their residency in a non-sanctioned country.  Finally, following the February 2020 withdrawal of the assets in his account, Mr. Abbasi did not have any further contact with Bittrex prior to the Petition Date.[103]

---

[96] AA-1250–58.

[97] AA-1250–58; AA-1522.

[98] AA-1262.

[99] *Id.*

[100] AA-1401.

[101] AA-1401–28.

[102] Des. Bankr. D.I. 557; AA-1283; AA-1426; 2/9/24 Tr. at 25:15–26:2 (Maria testimony).

[103] AA-968; AA-1105–73.

## VI.    CONCLUSION[104]

For the reasons set forth above, the Orders will be affirmed.  The Court will issue a separate

Order consistent with this Opinion.

_____

[104] The Court rejects Appellants' remaining arguments.